UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| JESSE WESTERMAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )  No. 2:13-CV-00014-GZS |
| | ) |
| CUMBERLAND COUNTY, et als., | ) |
| | ) |
| Defendants. | ) |

**RECOMMENDED DECISION**

Jesse Westerman and Brendan Collins complain against Cumberland County and certain officers associated with the operation of the Cumberland County Jail that they were unlawfully made to clean human waste following a toilet overflow using inadequate protective supplies. They allege a violation of their Eighth Amendment and Fourteenth Amendment rights and a breach of due care in the operation of the prison facility. The defendants have filed a motion for summary judgment against all claims, which the Court referred for report and recommended decision. Based on the summary judgment record, I recommend that the Court grant, in part, the motion, dismiss the section 1983 claim with prejudice, and dismiss the state law claim without prejudice.

**FACTS**

The non-moving party is entitled to have the summary judgment facts considered in the light most favorable to his cause. Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011). By local rule, summary judgment facts are introduced by means of "a separate, short, and concise statement of material facts," which statement must be supported by record citations. D. Me. Loc. R. 56(b), (c), (d). Here, the court's review of the record is guided by the Defendants'

Statement (ECF No. 25), the Plaintiffs' Opposing Statement and Additional Statement (ECF No. 28-1), and the Defendants' Reply Statement (ECF No. 33).

On June 20, 2011, Jesse Westerman and Brendan Collins were incarcerated at the Cumberland County Jail. (Statement ¶ 1.) Westerman had been arrested on a warrant for not paying a fine and was in jail waiting to go to court. (Id. ¶ 2.) Collins was in jail on a warrant for an unpaid fine and a possession charge. He was waiting to go to court and see a judge and was not serving time. (Id. ¶ 3.) Westerman and Collins shared a cell in pod C1. (Id. ¶¶ 4-5.) On June 20, 2011, the toilet in their cell overflowed. (Id. ¶ 6.) The inmates in the cell next to them were repeatedly, rapidly flushing the toilet, which caused the overflow. (Id. ¶ 7.)

The toilet overflow had fecal matter, toilet paper, and urine in it. (Id. ¶ 8.) The toilet overflowed into the cell of Westerman and Collins, into the adjacent cell, and into the dayroom. (Id. ¶ 9.) Westerman and Collins's cell had waste that was one to two inches deep. (Id. ¶ 11.) During the time the toilet was overflowing, the two officers in the pod ordered that the pod be locked down. (Id. ¶ 13.) One or both corrections officers ordered Westerman and Collins to clean up the mess. (Id. ¶ 14.) Other inmates started slamming and kicking the doors, swearing, and yelling racial slurs and threats because they wanted the mess cleaned up so the dayroom would not be in lockdown status. (Id. ¶¶ 16-17.) Westerman and Collins complied based on a fear of disciplinary action and because of a feeling of intimidation arising from the conduct of the other inmates. (Id. ¶ 18; Opposing Statement ¶ 18.) They were given gloves, which they put on, two mops, a cleaning solution, and one or two buckets. (Statement ¶ 19.) Sometime after they started, another officer brought them a shop vac. Westerman and Collins picked up or vacuumed solid waste and mopped up the liquid waste. (Id. ¶¶ 20-21.) They then sprayed the floor with the cleaning solution and mopped again. (Id. ¶ 22.) When they were done, there was

no more fecal matter on the floor and the cell was dry, but the stench of urine and feces remained. (Id. ¶ 23.) The toilet was still backed up and was full of feces and urine, but it no longer was overflowing. (Id. ¶ 24.)

Westerman put a tote top over the toilet to try to mask the odor and hide the contents from view. (Id. ¶ 25.) Westerman and Collins were wearing boat shoes constructed with rubber soles and a canvas top. Their shoes and feet got soaked when they were cleaning. (Id. ¶ 26.) They remained in dirty and wet pants and were not issued clean clothing until later that evening, after the passage of a few hours. Collins does not recall when he finally received clean shoes, but both men received showers that evening after waiting some hours. (Id. ¶¶ 27-29.) That night, they rang the buzzer to be let out to use the bathroom in the dayroom because their toilet was still clogged. (Id. ¶ 30.) The toilet was fixed the next day. (Id. ¶ 31.) It is a fair inference from the evidence that the men spent the overnight in a foul-smelling cell with a dry, but unsanitary floor surface.

Collins has been incarcerated in the Cumberland County Jail approximately six times in the last ten years and during this time he has never had to clean a toilet overflow other than on this one occasion and he has not seen other inmates clean toilet overflows. (Id. ¶ 33.) Westerman has been incarcerated in the Cumberland County Jail on other occasions and during this time he has never had to clean a toilet overflow other than on this one occasion and he has not seen other inmates clean toilet overflows. (Id. ¶ 34.)

Westerman was released the day after the toilet overflowed. (Id. ¶ 32.)

On June 20, 2011, Westerman, who is African-American, was subjected to racial epithets from inmates who were angry with him and with Collins because the pod was

locked down.  (Additional Statement ¶ 1.)  The corrections officers on the pod who ordered the plaintiffs to clean up the area were young, one male and one woman.  (Id. ¶ 2.)  Westerman was afraid that he may have contracted a disease from the incident, but was too afraid to get checked or tested for possible illnesses.  (Id. ¶ 3.)

On June 20, 2011, a sergeant entered the pod while the plaintiffs were cleaning the sewage and addressed the corrections officers, stating that inmates should not be cleaning up waste from overflowed toilets.  (Id. ¶ 5.)  Cumberland County has an official jail policy, Policy F-309, that prohibits inmates from handling biohazard materials.  (Id. ¶¶ 6-7.)  According to Policy F-309, a biohazard "[r]equires the observance of universal precautions which mandates that all human blood and body fluids are to be treated as if known to be infectious HIV, HBV, bloodborne pathogens, and airborne pathogens."  (Id. ¶ 7;  Policy F-309, ECF No. 23-14.) According to the Policy, "At no time shall inmates be used to clean any biohazard material." (Id.)

On October 7, 2011, several weeks after the incident that gives rise to this litigation, Major Francine Breton authored a memorandum to "clarify questions as to what is biohazard material and what is not."  (Additional Statement ¶¶ 8-9; Breton Memo, ECF No. 23-13.)  Citing the "Bureau of Waste Remediation and Management" Major Breton wrote that "urine and feces" and "sludge, septage, and waste water" are not considered biohazards.  (Id.)  Major Breton further wrote that OSHA does not consider exposure to feces, urine, and other bodily fluids to be regulated by OSHA's bloodborne pathogens standards.  (Id.)  The memo concludes by directing CCJ officials not to use biohazard containers when such fluids are present.  (Id.)

The Maine County Commissioners Association Self-Funded Risk Management Pool is a public self-funded pool established pursuant to 30-A M.R.S.A. ch. 117.  (Statement ¶ 35.)

4

Cumberland County is a Named Member of the Risk Pool and is provided with insurance-type coverage pursuant to a document entitled "Maine County Commissioners Association Self-Funded Risk Management Pool Coverage Document." (Id. ¶ 36.) The Coverage Document specifically excludes any coverage for any cause of action seeking tort damages for which the County is immune pursuant to the Tort Claims Act, and limits coverage to those areas for which governmental immunity is expressly waived by the Tort Claims Act. (Id. ¶ 37.) Other than the insurance-type coverage provided to Cumberland County under the Risk Pool's Coverage Document, Cumberland County has not procured insurance against liability for any claim against the County or its employees for which immunity is not otherwise waived under the Maine Tort Claims Act. (Id. ¶ 38.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court reviews the factual record in the light most favorable to the non-moving party, here the plaintiffs, resolving evidentiary conflicts and drawing reasonable inferences in their favor. Hannon v. Beard, 645 F.3d 45, 47-48 (1st Cir. 2011). If the court's review of the record reveals evidence sufficient to support a judgment in favor of the non-moving party on one or more of their claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**DISCUSSION**

The complaint recites two counts. In the first count the plaintiffs seek a remedy through 42 U.S.C. § 1983, alleging a violation of their rights under the Eighth Amendment and the Fourteenth Amendment based on an act of "deliberate indifference." In the second count the plaintiffs assert claims of negligence. The defendants argue they are entitled to summary judgment on both claims.

**A.   The Constitutional Claim**

Title 42 of the United States Code, section 1983, confers upon every United States citizen a right to redress against any person who, acting under color of state law, causes a deprivation of his or her "rights, privileges, or immunities secured by the Constitution and laws" of the United States. To maintain a claim under section 1983, a plaintiff must establish two things: (1) that the conduct complained of has been committed under color of state law and (2) that this conduct worked a denial of rights secured by the Constitution or laws of the United States." Barreto-Rivera v. Medina-Vargas, 168 F.3d 42, 45 (1st Cir. 1999) (citing Martinez v. Colon, 54 F.3d 980, 984 (1st Cir. 1995)). Other than providing a cause of action, section 1983 of the Civil Rights Act does not confer any substantive rights; the rights that are vindicated in the action have to arise under another federal statute or constitutional provision. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). "As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." County of Sacramento v. Lewis, 523 U.S. 833, 842 n.5 (1998).

In this case, the plaintiffs allege a violation of their Fourteenth Amendment Due Process right to protection against deliberate indifference toward exposures to substantial risks of serious harm in the prison environment. They claim a deprivation of this right based on being made to

clean up the waste effluent of an overflowing toilet system. They assert their claim against the jail administrator, the sheriff, and the people of Cumberland County, none of whom were present when the incident transpired. They also name a John Doe defendant in their complaint, but the complaint was never amended to name either of the corrections officers who actually ordered the cleanup.

The defendants argue that summary judgment in their favor is proper because there is no evidence of a municipal custom, practice, or policy of deliberate indifference, no evidence of supervisory condonation, encouragement, or the like, and no evidence of failure to train. The defendants also dispute the existence of a trial-worthy underlying claim. (Motion at 3-9.)

**1.     Deliberate indifference**

The parties' memoranda reflect agreement with the proposition that the plaintiffs' claims must be measured by the deliberate indifference standard. Under both the Eighth Amendment and the Fourteenth Amendment, sentenced prisoners and pretrial detainees are entitled to protection against acts reflecting deliberate indifference toward prison conditions imposing a substantial risk of serious harm. Burrell v. Hampshire Cnty., 307 F.3d 1, 7 (1st Cir. 2002) (involving inmate violence); Giroux v. Somerset Cnty., 178 F.3d 28, 32 (1st Cir. 1999) (same). A deliberate indifference claim has two elements. First, the prisoner must demonstrate that he was subjected to a condition that posed a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 834 (1994). Second, the prisoner must demonstrate that the officer who imposed the risk acted with a state of mind sufficiently culpable to amount to deliberate indifference. Id.

"[T]he Supreme Court has specified that deliberate indifference requires that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and he must also draw the inference*.'" Leavitt v. Corr. Med. Servs., 645

7

F.3d 484, 497 (1st Cir. 2011) (quoting Farmer, 511 U.S. at 837) (emphasis added). Deliberate indifference can be established, for example, with evidence that the defendant imposed the risk with punitive intent or with evidence that the defendant had "actual knowledge of impending harm, easily preventable." Id. (quoting Watson v. Caton, 984 F.2d 537, 540 (1993)). Deliberate indifference proscribes "a narrow band of conduct," such that a mere failure to do what a reasonable person would do under the circumstances (common law negligence) will not satisfy the standard. Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006). Deliberate indifference is on the order of something "repugnant to the conscience of mankind," Estelle v. Gamble, 429 U.S. 97, 105 (1976), taking into consideration "contemporary standards of decency." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). "[C]onditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." Id.

The defendants contend that neither the objective seriousness element nor the subjective indifference element is established on this record. (Motion at 4, ECF No. 24.) The plaintiffs say that direct exposure to human waste through cleaning activity necessarily presents a substantial risk of serious harm, as does spending the night in a cell that was not sanitized following the overflow event and that holds the stench of urine and feces. (Response at 9, ECF No. 28.) As for deliberate indifference, the plaintiffs say the two officers who issued the cleanup order were aware of an excessive risk because of existing policy that could be interpreted as describing body fluids as biohazards, because of common sense, and because the defendants should have appreciated that their existing policy was vague concerning prisoner participation in cleaning up human waste. (Response at 10-12.)

When it comes to exposure to human waste, the cases reflect that both the duration and the severity of the exposure are important factors in a deliberate indifference evaluation. E.g.,

8

Despain v. Uphoff, 264 F.3d 965, 974 (10th Cir. 2001) (describing cell block flooded with human wastes for roughly 36 hours and non-functioning toilets for the same period, with prisoners urinating through the bars of their cells and into standing water in the hallways) (cited with approval in Surprenant v. Rivas, 424 F.3d 5, 20 (1st Cir. 2005)); Fruit v. Norris, 905 F.2d 1147, 1151 (8th Cir. 1990) (describing prison work duty in a waste well with human waste showering down from above and an absence of protective clothing). Anytime direct exposure to human waste is involved, prison authorities must be attentive not only to the health risks that result, but also to human dignity and standards of decency. Gamble, 429 U.S. at 102. Nevertheless, the sort of exposure at issue in this case and the lack of a record of subjective deliberate indifference fail to raise a genuine constitutional issue. See, e.g., Rish v. Johnson, 131 F.3d 1092, 1100 (4th Cir. 1997) (2-1 panel opinion) (holding that the existence of universal precautions relating to the handling of body fluids does not suffice to demonstrate deliberate indifference toward a substantial risk of serious harm when universal precautions are not observed); Florio v. Canty, 1:12-cv-08348-AJP, 2013 WL 3781549, at *1, *6-7, 2013 U.S. Dist. LEXIS 102064, at *2, *22-23 (S.D.N.Y. July 22, 2013) (dismissing complaint alleging similar flooding and cleanup duty and collecting cases); Torres v. Cormier, 5:12-cv-00063-cr-jmc, 2012 WL 5330980, at *5-6, 2012 U.S. Dist. LEXIS 155410, at *17-18 (D. Vt. Sept. 19, 2012) report and recommendation adopted, 2012 WL 5328741, 2012 U.S. Dist. Lexis 156312 (D. Vt. Oct. 29, 2012) (dismissing complaint involving similar flooding and cleanup duty, finding insufficiently serious risk in exposure to waste through cleanup duty and that official's "admittedly imperfect" efforts to help the plaintiff clean his cell were "hardly indicative of indifference"); Wyland v. Brownfield, 2:08-cv-01601-MPK, 2011 WL 5445305 at *1, *5, 2011 U.S. Dist. LEXIS 129457, at *16 (W.D. Pa. Nov. 9, 2011) ("[H]aving to clean a moldy shower with backed up sewage

9

without gloves or a mask on [one] single occasion simply do[es] not give rise to a substantial risk of serious harm or challenge common standards of decency."); see also Ortiz v. Dep't of Corr., 1:08-cv-02195-RJS-HBP, 2011 WL 2638137, at *1, *6-7, 2011 U.S. Dist. Lexis 71897, at *3, *15-21 (S.D.N.Y. Apr. 29, 2011) (recommend decision collecting cases describing both actionable and non-actionable claims).

In this case, the plaintiffs were exposed to human waste and, as a consequence of the cleanup order, came into contact with waste water that soaked through their shoes and with waste solids that they picked up with gloved hands. Thanks to their unenviable work, the flooded condition did not persist for long, but they still endured an overnight in a foul-smelling cell with an unsanitary floor. Based on these facts, the greatest hazard they faced appears to have come from the saturation of their shoes with waste-infected water. The failure to supply the plaintiffs with appropriate footwear or footwear coverings was unreasonable, but the record does not support a finding that this failure, singly or in combination with the other facts and circumstances, deprived the plaintiffs of a constitutional right.

   2.   **Supervisory and municipal liability**

Absent an underlying constitutional deprivation, the supervisory defendants cannot bear liability. Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 583 (1st Cir. 1994) ("Supervisory liability attaches only if a plaintiff can demonstrate by material of evidentiary quality an affirmative link between the supervisor's conduct and the underlying section 1983 violation."). The plaintiffs argue that the "vague" state of Cumberland County's policy on using inmates to clean up human waste is itself a constitutional violation that would warrant relief. (Response at 11.) However, the record presented by the plaintiffs does not demonstrate the existence of a policy, custom, or practice that has resulted in a constitutional violation and

10

without such evidence it is not the province of this Court to prescribe prison policy through injunctive relief. Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)).

B. **The State Law Tort Claim**

In their second count, the plaintiffs advance a state law claim of negligence against all of the defendants. The defendants assert immunity defenses under the Maine Tort Claims Act. (Motion at 9-14.) The plaintiffs respond that the MTCA's exception to immunity for "operation and maintenance" of a public building applies here and that discretionary function immunity cannot shield the defendants because orders concerning the cleaning of human waste involve ministerial rather than discretionary acts. (Response at 12-14, citing 14 M.R.S. §§ 8104-A(2) & 8104-B(3).)

I recommend that the Court not reach these state law questions. "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). I do not see special circumstances here that would warrant removing this case from the general rule. I recognize that the running of the two-year statute of limitation found in 14 M.R.S. § 8110 is an important consideration here. However, the Maine Revised Statutes chapter governing the limitation of actions includes a provision permitting the "commencement of [a] new action after failure." 14 M.R.S. § 855. According to this statute, when an action is "defeated for any matter of form . . . the plaintiff may commence a new action on the same demand within 6 months after determination of the original action." Id. Although the application of this statute following a federal dismissal of pendent state law claims has not been discussed in any prior decision of this

11

Court, the Maine Superior Court, or in an opinion of the Maine Supreme Judicial Court, the District of Massachusetts applies a very similar Massachusetts statute in this manner.  See Duca v. Martins, 941 F. Supp. 1281, 1295 n.14 (D. Mass. 1996) (applying Mass. Gen. Laws ch. 260 § 32 and citing Liberace v. Conway, 574 N.E.2d 1010, 1012-13 (Mass. App. Ct. 1991), review denied, 579 N.E.2d 1361 (1991) (holding that M.G.L. ch. 260 § 32 applies to state law claims dismissed by federal court that declined to exercise pendent jurisdiction and describing dismissal without prejudice as "an essentially technical disposition" that should be likened to a dismissal based on "form")).

Because the plaintiffs' state law claim has been "defeated" in this Court based not on the substance of the claim, but rather based on the "form" of their plea for an exercise of supplemental jurisdiction, state law affords them an opportunity to pursue their claim in state court so long as they do so within six months of the final determination of the federal claim.  I therefore recommend that the Court dismiss the pendent state law claim without prejudice.

## CONCLUSION

For reasons set forth above, I recommend that the Court grant, in part, the Defendants' Motion for Summary Judgment (ECF No. 24) and dismiss count I, the sole federal claim, with prejudice.  I further recommend that the Court not grant summary judgment against count II, the state law claim, but rather dismiss it without prejudice.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

December 18, 2013